IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |
|---|---|
| MAXINE J. TAYLOR, | * |
| Plaintiff, | * |
| v. | * |
| ANNE ARUNDEL COUNTY, MARYLAND, et al., | * CIVIL NO.: WDQ-12-2468 |
| Defendants. | * |

*     *     *     *     *     *     *     *     *     *     *     *     *

MEMORANDUM OPINION

Maxine J. Taylor sued Anne Arundel County, Maryland (the "County") and Michael Borgese for employment discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),[1] and other claims.  On September 15, 2013, the Court granted Borgese's motion to dismiss.  Pending is the County's motion for summary judgment.  No hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2011).  For the following reasons, the motion will be granted.

---

[1] 42 U.S.C. §§ 2000e, *et seq.*

I.  Background[2]

In 2005, Taylor--an African American woman--began working for the Anne Arundel County Department of Detention Facilities as a Corrections Officer ("CO").  ECF No. 25-2 (hereinafter "Kokolis Aff.") at ¶ 2.  When Taylor began working for the County, she was given a copy of the County's "Non-Discrimination and Non-Harassment in Employment Policy."  *Id.* at ¶ 3.  The policy stated:

> All reported or suspected occurrences of forbidden harassment will be promptly and thoroughly investigated.  Where forbidden harassment or discrimination has occurred, Anne Arundel County will take appropriate disciplinary action, including, without limitation, suspension or termination.
>
> This policy prohibits any retaliation against any employee raising a complaint or providing information concerning an alleged violation of this policy.

ECF No. 25-2 at 4.  The policy also detailed the procedure for reporting a violation and the steps of the investigation.  *See id.* at 5-8.

---

[2] The facts are taken from the complaint, ECF No. 1; the County's motion, ECF No. 25; Taylor's opposition, ECF No. 28; the County's reply, ECF No. 31; and their supporting exhibits.

In reviewing a motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In 2006, Taylor received a letter of reprimand for filing a false report.  ECF No. 28-13.  In 2009 and 2010, Taylor received satisfactory performance evaluations.  ECF No. 28-16 at 2. Between 2010 and 2011, Taylor was assigned to the Ordnance Road Correctional Center ("ORCC").  Kokolis Aff. at ¶ 2.

   A. Taylor's Interactions with Capt. Borgese

   At ORCC, Capt. Michael Borgese "was not [] Taylor's immediate supervisor but was in her chain of command."  Kokolis Aff. at ¶ 5.  Some time in November 2010, Taylor had a package sent to her at ORCC.  Taylor Dep. at 281:1-282:18.  Employees at ORCC are discouraged from having personal mail sent to the facility, and are informed that their packages are subject to search.  ECF No. 28-16 at 1.  Borgese intercepted and opened the package.  Taylor Dep. at 281:1-282:18.  The package was sent from a business address, but was from Taylor's partner.  *Id*. After intercepting the package, Borgese read Taylor's personal emails,[3] and learned that Taylor was lesbian.[4]  *Id*.

---

[3] The County denied that Borgese ever read Taylor's emails.  *See* ECF No. 28-16 at 2.

[4] Borgese never said anything about Taylor's sexual orientation at the time.  Taylor Dep. at 282:26-18.  When questioned whether Borgese ever told her that he knew she was a lesbian, Taylor stated, not "in so many words."  *Id*.
   The County disputes that anyone knew Taylor's sexual orientation.  *See* ECF No. 28-16 at 2.  However, the County also

After the package incident,[5] Borgese asked Taylor to lunch in the cafeteria.  Taylor Dep. at 240:3-14.  On another occasion, Borgese sat down at the table where Taylor was eating lunch and started a "general conversation."  Taylor Dep. 240:18-242:3.  Borgese asked what Taylor did for the weekend, and they "began talking about fitness."  *Id*.  For example, Borgese "gave [Taylor] some insight" on the health effects of vinegar.  *Id*. Taylor thought it was "a little bit out of the norm" for them "to have a conversation based on what [she] did for the weekend," but did not think the conversation was improper, and was not uncomfortable.  *Id*.

On another occasion, Taylor was having a conversation about tattoos and body art with another CO in the control center.

---

states that "the fact that [] Taylor may have had a girlfriend actually came to [] Borgese's attention a year earlier in November 2009 and had no repercussions whatsoever."  *Id*. (detailing how in November 2009, Borgese received a domestic violence report from the police involving Taylor and her girlfriend).  Terry Kokolis, the Superintendent of the Department of Detention Facilities, and the person who made the ultimate termination decision stated that he did not know that Taylor was in a lesbian relationship because he thought she was in a relationship with a male corrections officer.  Kokolis Dep. at 53:8-54:9.

[5] Unless otherwise indicated, all the following events occurred between November and December 2010.  During her deposition, Taylor could not recall the exact dates of these events, but knew that they occurred between Borgese confiscating her package and the incidents of January 2011.

4

Taylor Dep. at 242:10-243:19.  Borgese walked by during the conversation.  *Id*.  Later that day, Borgese and Taylor had a conversation about tattoos, and Borgese told her that he knew a good tattoo artist.  *Id*.  Taylor did not think the conversation was wrong or improper "at that time."  *Id*.

At another time, Taylor was again discussing tattoos with another CO as Borgese passed.  Taylor Dep. 244:4-246:10. Borgese called Taylor into his office.  *Id*.  He gave her the name and address of the tattoo artist he had mentioned before, and pulled up his pant leg to show Taylor his tattoo.  *Id*. Borgese offered to take Taylor to the artist later if she wished.  *Id*.  Taylor did not feel uncomfortable during the conversation.  *Id*.

Also in November or December 2010, Cpl. Holly Whittington-- another ORCC employee and Borgese's girlfriend--approached Taylor.  Taylor Dep. 247:21-248:20.  Whittington told Taylor that Borgese "wanted her to show [Taylor] her tattoo."  *Id*. Whittington showed Taylor the tattoo on her lower back.  *Id*.

Prior to January 2011, Borgese asked Taylor to talk to Whittington about how Taylor liked the fitness routine P90x. Taylor Dep. at 250:1-251:15.  When Taylor talked to Whittington, she "chuckled in a sort of [] flirty way," and said that Borgese

liked her "hot and wet." *Id.* Taylor now asserts that there was an "underlying message" in this conversation, but she does not know what it was. *Id.*

In late November or early December 2010, Borgese told Taylor that he was going to change her shift. Compl. at ¶ 15. Taylor objected and Borgese said, "maybe we can work something out." *Id.* at ¶ 16. He then let Taylor choose her own shift. *Id.* In December 2010, Taylor applied for a promotion to corporal. ECF No. 28-16 at 2.

On December 28, 2010, Borgese approached Taylor and asked her to talk to Whittington. Taylor Dep. at 258:6-259:16. Borgese wanted Taylor to convince Whittington that she should dress up in a blue suit like the female character in the movie *Avatar*. *Id.* Taylor sent Whittington an email, and the following email exchange occurred:

> Taylor: I think and was told the 'BLUE SUIT' like the female in the movie 'AVATAR' would look AMAZING on you…lol…Me personally, I think it would be STUNNING!!!!!!!!!!!!!!! LOL…have a wonderful New Years…I think that will be my wedding gift to you'll…yea…the 'BLUE SUIT' LMBO!

> Whittington: lol…He is soooooo dumb. It would make his day if I were to wear that suit for him. The two of you are soooooo funny. You have a wonderful New Years too…

> Borgese: [I] would much prefer body paint on her
> instead of the suit, but I want the tail attached
> somehow.........
>
> Taylor: sexy!!!!!!!!!!!!! That's HOTTTTTTTTTTTTTT! LOL

ECF No. 25-1 at 31.

On December 29, 2010, when Taylor passed Borgese's office, he called her inside.  Taylor Dep. at 262:3-263:19.  Because she was feeling uncomfortable, Taylor's "face was a bit contorted" when she entered the office.  *Id*.  After seeing Taylor's face, Borgese immediately gave her a hug.  *Id*.  Taylor pushed Borgese back and asked him what he was doing.  *Id*.  Borgese did not respond, and Taylor left the office.  *Id*.

Later that day, Taylor talked to Officer Miller about the incident.  Taylor Dep. 264:6-265:21.  Miller said that Borgese had "been harassing her too."  *Id*.  Specifically, Borgese would comment on her attire, and buttoning her shirt.  *Id*.  Taylor also talked to Corporal Philip Curley[6] about the hug, but she could not remember when she did so.  *Id*.  Taylor never reported the hug to her superiors, and never filed a complaint about any of her interactions with Borgese.  Taylor Dep. at 254:6-13.

---

[6] Between late 2010 and the incidents of January 2011, Taylor and Curley were engaged in a sexual relationship.  ECF No. 31-3 (hereinafter "Curley Dep.") at 29:2-20.

Taylor did not have any personal contact with Borgese after December 29, 2010.  Taylor Dep. at 270:7-10.

B. January 2011 Incidents and Investigation

In January 2011, "an inmate[] complain[ed] that other inmates were exchanging commissary items, which is prohibited, and that this activity was permitted by Officer Taylor and other officers."  ECF No. 25-2 at 23.  The subsequent investigation, conducted by Lt. Earl Ahmay, led ORCC management to conclude that Taylor had facilitated a relationship between inmates Kimberly Morgan and Elizabeth Snyder.  ECF No. 25-2 at 11-14.

1.  January 7th Incident

Video surveillance of January 7, 2011 showed Snyder leaving the C-1 housing unit with the permission of Officer Nance.  ECF No. 25-2 at 23.  Officer Nance "told management that Officer Taylor sent an email requesting to see [] Snyder on her post." *Id.*  Taylor let Snyder into the C-4 housing unit.  *Id.*  Morgan, who was housed in the unit, joined Snyder and Taylor at the security desk.  *Id.*

The three remained at the security desk for 14 minutes. *Id.*  During that time, the video shows Taylor covering the intercom speaker that connected to central control with her hand.  *Id.*  The County "contends she did [this] to prevent other

8

officers at the Control post from hearing the conversation." *Id.*

"The video also show[ed] contraband being passed from [] Morgan to [] Snyder above the podium ledge and [] Snyder placing what appears to be a note in her breast pocket." *Id.* Snyder and Morgan leave the video frame for two minutes when Morgan walks Snyder to the housing unit door. *Id.* Taylor did not search Snyder when she entered or left the unit. *Id.* When Snyder returned to her unit, she was searched by another officer, but no contraband was discovered. ECF No. 28-10 (hereinafter "Borgese Dep.") at 167:15-168:10.

2. January 10th Incident

On January 10, 2011, Taylor was assigned to the C-1 unit, and Corporal Watkins was assigned to the C-4 unit. ECF No. 25-2 at 24. Video surveillance showed Taylor walking to the door of the C-1 unit with Snyder. *Id.* At that time, Morgan walked to the door of the C-4 housing unit. *Id.* The doors "lead[] to the Core, which is the central hallway leading to each of the four housing units. *Id.* The Core did not have a video camera. *Id.*

Officer Watkins had not given Morgan permission to leave the unit, and he said that he had left the door locked.[7]  *Id.*

After entering the Core, Morgan, Snyder, and Taylor were out of frame for 16 minutes.  *Id.*  After 16 minutes, the video showed Taylor and Snyder reentering C-1 as Morgan returned to C-4.  *Id.*  Watkins discovered Morgan reentering the unit, and asked her where she had been unescorted.  *Id.*  Morgan responded that "Taylor called her into the Core."  *Id.*

"Additional video footage from January 10, 2011 taken from the upper level day rooms of C-1 and C-4" showed "Taylor . . . removing [] Morgan from her unit and then the two inmates and [] Taylor are seen standing by the upstairs door talking for about eight minutes."  *Id.*

3. Investigation

While conducting the investigation, Lt. Ahmay interviewed Snyder and Morgan.  ECF No. 25-3 at 4.  The inmates admitted that they were in a relationship before coming to ORCC, Taylor helped them see one another, and they had shared a kiss while in the Core on January 10, 2011.  *Id.* at 4-5.  Because their admissions included information about sexual contact, Borgese

---

[7] This information led ORCC management to allege that Taylor had unlocked the door for Morgan without permission.  ECF No. 25-2 at 24.

initiated a separate investigation under the Prison Rape Elimination Act ("PREA").[8]

Taylor offered a different version of events.[9]

On January 6, 2011 while relieving Officer Nance for her break on unit C-1, Inmate Snyder asked to speak with her about an important matter. Officer Taylor told Inmate Snyder that she could not meet with her until later in the shift, but was unable to return to C-1 that evening. Officer Taylor stated that on January 7, 2011, she was assigned to unit C-4 and remembered that Inmate Snyder had asked to speak with her. Officer Taylor stated that she had a history with Inmate Snyder and some of her issues. She stated that she sent an email to Officer Nance on unit C-1 and asked her to send Inmate Snyder to her post. Officer Taylor stated that when Inmate Snyder entered the unit, Inmate Morgan came down from the upper level and both inmates approached her podium. Officer Taylor stated that Inmate Snyder wanted to discuss an educational issue. Officer Taylor contends that she placed her hand over the intercom because the noise coming from the speaker was too loud. Officer Taylor stated that after the discussion, Inmate Snyder was sent to the door and Officer Taylor released her from the unit.

Officer Taylor stated that on January 10, 2011 she was assigned to unit C-1. She stated that when she returned from her lunch break, she noticed that Inmate Snyder was crying and would not stop. Officer Taylor

[8] Borgese conducted the separate PREA investigation. *See* ECF No. 25-3 at 13 (PREA Investigation Report). When it was concluded that only a consensual kiss occurred, and that this conduct was not covered by the "PREA," the investigation ended. *See* ECF No. 25-3 at 15 (Borgese concluded that there was "no evidence indicating sexual assault."); ECF No. 28-7 (email between Bill Martin, Borgese, and Sergeant Vella).

[9] This is a summary of Taylor's testimony at her Step 3 disciplinary hearing. ECF No. 25-2 at 26.

stated that she asked Inmate Snyder why she was crying
and she responded that she was being bullied and
teased by other inmates in her dorm because she had no
hygiene items and could not shower. Officer Taylor
stated that she noticed Inmate Snyder's body odor when
she saw her on January 6th and offered to get her a
hygiene kit. She told Officer Taylor that she was
allergic to the 3-in-1 soap which Officer Taylor
verified with the medical department. Inmate Snyder
told Officer Taylor that she had a friend named Kim
(Inmate Morgan) in C-4 who was willing to share some
hygiene items with her. Officer Taylor stated that she
called Corporal Watkins on C-4 and requested the
transfer of toothpaste, soap, and deodorant to Inmate
Snyder. Officer Taylor stated that about an hour
later, she went to get the hygiene items from Inmate
Morgan on C-4. Inmate Snyder walked with her to the
unit door and stayed there while she went to C-4 by
herself. Officer Taylor stated that the door to unit
C-4 was unlocked so she opened it and yelled for
Inmate Morgan. Another inmate retrieved Inmate Morgan
from the dorm and Officer Taylor asked her for the
hygiene items. Inmate Morgan told her that she
previously agreed to give Inmate Snyder some hygiene
items but that she changed her mind. Officer Taylor
stated that she returned to C-1 and told Inmate Snyder
that Inmate Morgan would not give her the hygiene
items.

After explaining the situation to Inmate Snyder,
Officer Taylor stated that she went into the strip
search room to retrieve personal items for an inmate
who was scheduled for release that night. She stated
that while she was in the strip search room, she saw
Corporal Curley enter the unit from the Core. Officer
Taylor stated that when she was finished in the strip
search room, she returned to C-4 and asked Inmate
Morgan for the hygiene items again, but she said no.
Officer Taylor stated that while she was on her way
back to C-1, Inmate Snyder stepped outside the door
and asked if she could speak to Inmate Morgan. Officer
Taylor told her that she could not and told her to
step back into C-1. She stated that Inmate Snyder
remained by the door while she returned to the

security podium. Later, Officer Taylor told Inmate
Snyder that she would allow Inmate Morgan to explain
in person why she changed her mind about the hygiene
items and that was the purpose of the meeting on the
upper level of the C-4 day room. She stated that they
were together for a minimal amount of time on C-4
before she returned Inmate Morgan to her unit.

ECF No. 25-2 at 26.

During the investigation, Lt. Ahmay obtained a report from
Corporal Curley. ECF No. 25-4 at 7. Curley said that he had
walked through the Core during the 16 minute period on January
10, 2011. ECF No. 25-2 at 24. Curley said that he had not seen
anyone in the Core. When Curley entered the C-1 unit to relieve
Taylor, Curley saw Snyder standing by the bulletin board inside
the unit, but did not see Taylor because she "may have been in
the strip-search room." ECF No. 25-2 at 14. Curley also said
that he saw Taylor return to C-1 on her own without Snyder,
contrary to the video surveillance, and that he left the door to
the unit unlocked, so Snyder could have entered the Core on her
own. ECF No. 25-2 at 24.

Taylor also asserted that she was not aware of Morgan and
Snyder's prior relationship. ECF No. 25-2 at 17. During the
investigation, Lt. Ahmay confiscated the inmates' mail. ECF 25-
3 at 8. In letters to Morgan written before January 20, 2011,
Snyder stated that Taylor was "like her mom," Taylor knew of

13

Snyder and Morgan's relationship, and discussed Taylor bringing

Snyder to see Morgan.  *See* ECF No. 31-2 at 4, 8, 10.  The

letters were returned to the inmates.  ECF No. 25-3 at 8.

As part of the investigation, Borgese interviewed witnesses

in the presence of other ORCC personnel.  ECF No. 25-3 at 10.

Borgese "advocated for termination" to Ahmay.  Borgese Dep. at

127:12-128:8.

Between January 24 and February 1, 2011, the administrator

of ORCC, William Martin, corresponded with the Superintendent of

the Department of Detention Facilities, Terry Kokolis, about

Taylor's infractions.  ECF No. 28-13.  Kokolis thought the

allegations were "serious violations," and "bui[lt] a strong

case for discharge."  *Id*.  Martin agreed that "termination [was]

a strong consideration."  *Id*.

On February 1, 2011, Lt. Ahmay in his report on his

investigation, concluded that Taylor had violated ORCC policies,

and recommended an 18 day suspension without pay.  ECF No. 25-3

at 12.  On February 2, 2011, Taylor "informed Lt. Ahmay that

[she] intended on filing an EEOC complaint regarding the

allegation."[10]  ECF No. 25-4 (EEOC complaint).  After reviewing

---

[10] Her EEOC complaint is the only place in the record in which
Taylor contends that she told the County that she would be
filing with the EEOC.  In her opposition brief, Taylor asserts

14

Ahway's report, Martin told Kokolis that he would recommend suspension after the Step 1 hearing.[11]   ECF No. 28-13.

C. Taylor's Termination

On February 28, 2011, "a Step 1 Disciplinary Hearing was held [before Martin] on the recommended 18 day suspension as submitted by Lieutenant Earl Ahmay."   ECF No 25-2 at 11 (Step 1 Hearing Memorandum).   Taylor was charged with nine violations. ECF No. 25-2 at 11-14.   Taylor stipulated that she had not frisked the inmates as they were entering and leaving the units. *Id.*   She also stipulated that she removed Morgan from another officer's post on two occasions without the officer's knowledge or consent.   *Id.*   Taylor had a union representative, and was given the opportunity to present witnesses and evidence.   *Id.*

---

that she also informed Martin on February 28, 2011 after her Step 1 hearing that she would be filing an EEOC complaint.  *See* ECF No. 28 at 10.  However, this assertion is not supported by evidence in the record.

[11] Termination of a Department of Detention employee follows certain procedures.  An investigation is completed with a recommendation on punishment.  The administrator of the facility then conducts a hearing (Step 1), and agrees or disagrees with the punishment recommendation.  The superintendent then conducts another hearing (Step 2).  If the superintendent orders termination, a pre-discharge hearing is held.  After termination is confirmed, the employee can file a grievance with the County, which will then hold a hearing (Step 3) to review the investigation and termination.  *See* ECF No. 25-2 at 11-28 (hearing reports).

At the hearing, ORCC management testified about the letters between Snyder and Morgan.  Martin Dep. 63:9-14.  However, Martin refused to consider the information secondhand and asked to see the letters.  *Id*.  Sergeant Vella searched the inmates' belongings, and was able to recover two letters that had been previously been confiscated.  ECF No. 31-2 at ¶ 4.

After the hearing, Martin concluded that Taylor had committed all nine violations.  ECF No. 25-2 at 14.  Further, Martin found that the violations were "intentional and egregious," and Taylor had not been truthful.  *Id*.  Martin recommended termination.  *Id*.

On March 10, 2011, Martin and Kokolis exchanged emails stating that they had no intention of promoting Taylor, and that they should not consider Curley's promotion until the investigation had been completed because there was evidence that Curley may have lied.  ECF No. 28-13 at 6.

On March 14, 2011, Taylor took the exam for corporal.  ECF No. 25-4.  On March 21, 2011, Sergeant Darlene Tasker sent an email to Borgese stating that Taylor had come to her "to ask questions about being a black Sergeant and the promotion process for black people at the detention center."  ECF No. 28-12.  Further, Taylor had asked about a lawyer that another African

16

American employee had used to "successfully arbitrate her grievance of her termination." *See* ECF No. 28 at 10; ECF No. 28-12.  Borgese forwarded the email to Martin, who forwarded it to Kokolis.  *Id.*

On April 11, 2011, Kokolis held a Step 2 hearing.  ECF No. 25-2 at 16.  Taylor's union representative was present.  *Id.*  As in the Step 1 hearing, ORCC management and Taylor had the opportunity to present witnesses and other evidence.  *Id.* Kokolis determined that the "incidents represent[ed] serious breaches of security."  *Id.* at 18.  He was also "concerned" about Taylor's "lack of honesty in the entire incident," and her "clearly displayed favoritism towards these inmates."  *Id.* Taylor "was found to have committed conduct unbecoming, fraternized with inmates, permitted the passing of contraband, failed to search inmates for transfer, abandoned her post and provided false reports and testimony."  ECF No. 31 at 4. Kokolis ordered Taylor's termination.[12]  ECF No. 25-2 at 20.

On April 15, 2011, Taylor's application for corporal was certified as eligible.  ECF No. 28-16.  On May 3, 2011, Taylor

---

[12] Although Kokolis's decision was supposed to be independent, emails show that he discussed Taylor's case with Martin and his wife.  ECF No. 28-8 (Kokolis email to Martin requesting proof of the January 10th kiss); ECF No. 28-13 at 8.

was "referred for consideration as amongst the most qualified" candidates. *Id.*

On May 5, 2011, Kokolis held a pre-discharge hearing. ECF No. 25-2. Taylor was represented by legal counsel and a union representative. *Id.* She was also given "the opportunity to offer any information [she] felt was pertinent to [Kokolis's] decision to terminate [her] employment." *Id.* Taylor presented a letter by an ORCC nurse praising Taylor's character, and asserting that Snyder could not be trusted. ECF No. 28-15. On May 9, 2011, Taylor was terminated.[13] Kokolis Aff. ¶ 7. "There are no instances where any correctional officer was found to have either participated in or facilitated sexual contact with inmates that the Department has not terminated or accepted resignation in lieu of termination. There have been no other disciplinary cases involving this level of misconduct that did not result in termination." Kokolis Aff. at ¶ 9.

On May 15, 2011, Taylor filed a grievance with the Anne Arundel County Office of Personnel. ECF No. 25-2 at 22-23. On June 14, 2011, a Step 3 grievance hearing was held. *Id.* The hearing officer determined that Taylor had violated procedures

---

[13] The County asserts that Taylor "was treated as a potentially successful candidate for the position of corporal and would have been promoted to the position had she not been terminated for multiple infractions." ECF No. 28-16 at 2.

and facilitated meetings between the inmates.  *Id.* ("The meetings were corroborated by video evidence . . . witness statements, and by admissions made by the two inmates involved.").

D. Procedural History

On July 13, 2011, Taylor filed a Charge of Discrimination with the EEOC and the Maryland Commission on Civil Rights ("MCCR").  ECF No. 25-4.  On August 20, 2012, Taylor filed suit. ECF No. 1.[14]  On October 19, 2012, Borgese moved to dismiss.  ECF No. 4.  On September 15, 2013, the Court granted Borgese's motion to dismiss.  ECF Nos. 12-13.

On April 21, 2014, the County moved for summary judgment. ECF No. 25.  On May 15, 2014, Taylor opposed the motion.  ECF No. 28.  On June 2, 2014, the County replied to Taylor's opposition.  ECF No. 31.

---

[14] The complaint contains five claims against the County: sexual harassment (hostile work environment), in violation of Title VII; sex discrimination, in violation of Title VII; race discrimination, in violation of Title VII; retaliation, in violation of Title VII; and sex, race, and sexual orientation discrimination, in violation of Title 20 of the State Government Article of the Maryland Code, Md. Code Ann., State Gov't §§ 20-601, *et seq.*

In support of her discrimination claim, Taylor submitted the confidential disciplinary records of five alleged comparators:

Comparator A is a white female detention officer who was suspended for one day in 2005 for "allow[ing] inmates to speak to each other between housing units and [] leaving [her] post to deliver a message between inmates." ECF No. 28-1 at 1. Comparator A was disciplined by the prior superintendent, Richard Baker, and he noted her honest admission of her mistake. *Id*. at 1-2.

Comparator B is a bi-racial male employee who was not terminated after he was involved in an alleged shooting outside of work. *See* ECF No. 28-2; Kokolis Dep. at 56:1-59:13.

Comparator C is a white male employee who was given a two-day suspension in 2002 because "[n]ear the end of [his] shift, [he] left [his] post and proceeded to the Quartermaster's area to obtain Inmate Request Slips." ECF No. 28-4 at 1. Comparator C was disciplined by Superintendent Baker before Kokolis took the position, and Baker noted Comparator C's honest admission that he had left his post. *Id*. at 2.

In 2005, Comparator C received three letters of reprimand because he did not report an incident, and he accidentally left

20

doors open or unlocked that permitted inmates to enter certain areas.  ECF No. 28-4 at 4-6.  In each instance, Comparator C apologized for his conduct.  *Id.*

Comparator D is a white male who was disciplined by Kokolis after he posted inappropriate comments about inmates and a sergeant on Facebook.  ECF No. 28-5 at 6.  The severity of the posts led to a 12-day suspension for Comparator D.  *Id.*

Comparator E is a white male who accidentally released the wrong inmate.  ECF No. 28-6.  One inmate posed as another at discharge, and correctly answered all the verification questions.  *Id.*  Comparator E was given a 3-day suspension by Superintendent Baker for not closely examining the photographs that may have revealed the deception.  *Id.*  The incident resulted in a change in internal procedures.  *Id.*

II. Analysis

  A. Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[15]  In considering the motion, the judge's function

---

[15] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall'

is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [her] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

B. Sexual Harassment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "This provision 'not only covers terms and conditions [of employment] in the narrow contractual sense, but evinces a

---

. . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." *Ocheltree v. Scallon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, (1998)).  Title VII is violated "[w]hen the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotations omitted).

"Not all sexual harassment that is directed at an individual because of his or her sex is actionable.  Title VII does not attempt 'to purge the workplace of vulgarity.'" *Hopkins v. Balt. Gas and Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995)).  "The 'line between a merely unpleasant working environment ... and a hostile or deeply repugnant one' is not always easy to draw."  *Francis v. Bd. Of Sch. Comm'rs of Balt. City*, 32 F. Supp. 2d 316, 325 (D. Md. 1999) (quoting *Scannell v. Bel Air Police Dept.*, 968 F.Supp. 1059, 1063 (D.Md.1997)).  To survive an employer's motion for summary judgment on her hostile work environment claim, the plaintiff

must show that the offending conduct was: (1) unwelcome;[16] (2)

based on sex; (3) subjectively and objectively severe or

pervasive enough to alter the plaintiff's conditions of

employment and create an abusive atmosphere;[17] and (4) imputable

to the employer.  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179,

183-84 (4th Cir. 2001) (*citing Causey v. Balog*, 162 F.3d 795,

801 (4th Cir. 1998)).  The elements are the same under Title VII

or § 1981.  *Id.* at 184.

    Taylor has failed to cite any evidence that Borgese's

conduct was unwelcome, or altered her conditions of employment.

Taylor never filed a complaint or informed anyone in management

---

[16] An employee's complaint about the offending conduct indicates
that it was unwelcome.  *See EEOC v. Sunbelt Rentals, Inc.*, 521
F.3d 306, 314 (4th Cir. 2008).

[17] "In deciding whether the harassment . . . was sufficiently
severe or pervasive to bring it within Title VII's purview, we
must examine the totality of the circumstances, including '[t]he
frequency of the discriminatory conduct; its severity; whether
it is physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an
employee's work performance.'"  *Hopkins,* 77 F.3d at 753 (quoting
*Harris v. Forklift Sys., Inc.*, 114 S.Ct. 367, 371 (1993)).
    "The Fourth Circuit has established a high standard for
hostile work environment claims because 'Title VII was not
designed to create a federal remedy for all offensive language
and conduct in the workplace.'"  *Zidan v. Maryland,* No. SKG-10-
1792, 2012 WL 2923150, at *5 (D. Md. July 17, 2012) (quoting
*Hopkins,* 77 F.3d at 754).  "The Court must '[] distinguish
between those situations that indeed present serious impediments
to minority and female workers and those situations when human
nature simply is not at its best.'"  *Id.* (quoting *Ziskie v.
Mineta,* 547 F.3d 220, 229 (4th Cir.2008)).

about Borgese's actions.  Until the conversations with
Whittington about P90x and wearing a blue suit, Taylor did not
feel uncomfortable because of Borgese's behavior.  The first
instance in which Taylor objected to Borgese's actions was when
she pushed him away after he hugged her and left his office.
After this incident, Borgese never had another personal
conversation with Taylor.

   Taylor argues that Borgese "reviewed [her] evaluations,
changed her shift, and participated in discipline that led to
firing and failure to promote" because she rejected his hug.
ECF No. 28 at 15.  This falls well below the "high standard for
hostile work environment claims" established by the Fourth
Circuit.  *See Zidan*, 2012 WL 2923150, at *5.  Borgese permitted
Taylor to choose her own shift,[18] and until the investigation,
Taylor had normal performance evaluations.  Merely participating
in an investigation that he did not initiate, does not raise
Borgese's actions to the level of sexual harassment.

   Accordingly, the Court will grant the County's motion for
summary judgment on Taylor's sexual harassment claim.  *See*
*Hopkins*, 77 F.3d at 753-54.

---

[18] Taylor also did not know whether other employees were treated
any differently.

C. Employment Discrimination

The County asserts that summary judgment is proper on Taylor's Title VII employment discrimination claims because there is no evidence that Taylor was terminated because of her race or sex, and the County provided a nondiscriminatory motive for the termination. *See* ECF No. 25 at 17-18. Taylor argues that other employees were treated differently. ECF No. 28 at 5-6.

1. Methods of Proving Discrimination

A plaintiff can prove her employer's discrimination through one of two methods. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). These methods apply equally to substantive discrimination claims and Title VII retaliation claims. *See Kapel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998).

First, a plaintiff may use "any direct or indirect evidence relevant to and sufficiently probative of the issue," under "ordinary principles of proof." *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (internal quotation marks omitted). To avoid summary judgment, the plaintiff must produce "direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a

26

genuine issue of material fact." *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (alteration in original) (internal quotation marks omitted).

Absent direct evidence of discrimination, the Court applies the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).  If she does, "a presumption of illegal discrimination" arises, and the burden of production shifts to the employer to articulate a nondiscriminatory reason for its adverse decision.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

"If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981), and the *McDonnell Douglas* framework "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  The plaintiff must then prove by a preponderance of the evidence that "the proffered reason was not the true reason for the employment decision," and that the true reason was discrimination.  *Burdine*, 450 U.S. at 256.  She may do this

27

directly or indirectly, by "persuading the court that a discriminatory reason more likely motivated the employer" or by showing that the employer's explanation is "unworthy of credence." *Id*.

2. Taylor's Claim of Race and Gender Discrimination

"To establish a *prima facie* case of discrimination based on the enforcement of employee disciplinary measures, an employee must show that '(1) that he [or she] is a member of the class protected by Title VII, (2) that the prohibited conduct in which he [or she] engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him [or her] were more severe than those enforced against those other employees.'" *Artis v. U.S. Foodservice, Inc.*, No. ELH-11-3406, 2014 WL 640848, at *8 (D. Md. Feb. 18, 2014) (quoting *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993)); *see also Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir.1985).

"With regard to the second and third elements of a *prima facie* case, a plaintiff can meet his or her burden by producing evidence of misconduct of other employees that is sufficiently similar to her own misconduct to permit a sound comparison between the discipline imposed in her case and in the prior

28

cases."  *Id.*; *see also Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir.2013).  The plaintiff has the burden "to show that [she] [is] similar in all relevant respects to [her] comparator."  *Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th Cir. 2010).  "Comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances;"[19] however, "the similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."[20]   "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Haywood*, 387 Fed. App'x at 359 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)); *see also Popo v. Giant Foods LLC*, 675 F.Supp.2d 583, 589 (D. Md. 2009) (Quarles, J.).

The only evidence Taylor cites in support of her race and gender discrimination claims is the disciplinary records of her

---

[19] *Cook*, 988 F.2d at 511.

[20] *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir.2008).

five alleged comparators. *See* ECF No. 28 at 5-7. However, the circumstances for which these individuals were disciplined, and how they were disciplined differ greatly from Taylor's case.[21]

Three of the five comparators were disciplined by a different superintendent (Comparator A, C, and E). When a person is punished by a different decision-maker than a plaintiff, courts have routinely held that the individual is not a valid comparator. *See Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 Fed. App'x 255, 257 (4th Cir. 2007) ("If different decision-makers are involved, employees are generally not similarly situated."); *Allen v. Dorchester Cnty.*, No. ELH-11-01936, 2013 WL 5442415, at *14 (D. Md. Sept. 30, 2013) ("Because the decision-makers who imposed plaintiff's discipline differed from those who imposed discipline on [other] employees prior to 2005, the [other] employees disciplined prior to 2005 are not "similarly situated" to plaintiff.").

Further, the offenses of the remaining two comparators are not sufficiently similar to Taylor's to allow comparison.

---

[21] Further, the Court notes that one of the comparators is female, and another is bi-racial. "If plaintiff's comparators are from the same protected class, then any discrepancy in discipline is not attributable to plaintiff's membership in that class." *Allen v. Dorchester Cnty.*, No. ELH-11-01936, 2013 WL 5442415, at *15 (D. Md. Sept. 30, 2013); *see also Booth v. Maryland*, 327 F.3d 377, 383 (4th Cir. 2003).

*Lightner,* 545 F.3d at 265 ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."). Comparators B and D were both punished for behavior that was outside of work and not part of their official duties. In neither case, was the comparator charged with nine violations of procedure, including allowing sexual contact between inmates, and giving a false report. The record is devoid of any other evidence of race or gender discrimination; Taylor has failed to establish a *prima facie* case.

Even if the Court were to assume that Taylor has established a *prima facie* case of discrimination, she has failed to rebut the County's nondiscriminatory reason for her termination. The County asserts that Taylor was terminated because of her policy violations in January 2011. ECF No. 25 at 17. Taylor argues that summary judgment is improper because there are material issues of fact about whether she actually committed the offenses for which she was terminated. ECF No. 28 at 7-13.

The gravamen of Taylor's argument is that the County's investigation was improper; specifically, the County erred in not believing her account of events, Kokolis's decision was

31

improper because he consulted others, the PREA investigation was
unnecessary, and she was denied "the due process to which [she]
was contractually and statutorily entitled."  ECF No. 28 at 2,
7-13.  In essence, Taylor is arguing that the County did not
make the *right* decision.  However, this is not a due process
suit.  In an employment discrimination case, this Court does not
"sit as a kind of super-personnel department weighing the
prudence of [PHH's] decisions."  *DeJarnette v. Corning,
Inc.*, 133 F. 3d 293,299 (4th Cir. 1998) (internal quotation
marks omitted).  The purpose of this suit is not to determine if
the County made the *correct* decision in terminating Taylor,
rather, the purpose is to determine if that decision was
motivated by discriminatory animus.[22]

---

[22] *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) ("Even
if these investigations were improper or substandard, that does
little to help her establish that the reasons given for her
termination were not the actual reasons, and it certainly does
not give rise to a reasonable inference that her race or gender
was the real reason for her termination."); *Countess v.
Maryland*, No. ELH-12-02252, 2014 U.S. Dist. LEXIS 5508, at *25
(D. Md. Jan. 16, 2014) ("[T]he employee's mere dissatisfaction
with the thoroughness or speed of the employer's investigation
does not give rise to liability under Title VII."); *Karpel*, 134
F.3d at 1227-29; *see also Hux v. City of Newport News*, 451 F.3d
311, 315 (4th Cir. 2006) ("Once an employer has provided a non-
discriminatory explanation for its decision, the plaintiff
cannot seek to expose that rationale as pretextual by focusing
on minor discrepancies that do not cast doubt on the
explanation's validity, or by raising points that are wholly
irrelevant to it.").

"A plaintiff is entitled to a trial on the merits of a Title VII claim if [she] . . . establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not that the adverse employment action was the product of discrimination . . . ." *Darvishian v. Green,* 404 F. App'x 822, 828 (4th Cir. 2010).  Taylor has not carried this burden.  No reasonable jury could conclude that racial or gender discriminatory animus was a motivating factor in Taylor's termination.  Accordingly, the Court will grant summary judgment on the employment discrimination claims.

D. Retaliation

To establish a *prima facie* case of retaliation, Taylor must show 1) that she engaged in a protected activity; 2) her employer took an adverse employment action against her; and 3) there was a causal link between the protected activity and adverse action.  *Navy Fed. Credit Union,* 424 F.3d at 406.  The burden-shifting approach of *McDonnell Douglas* also applies to Title VII retaliation claims.[23]

The County asserts that Taylor has failed to supply any evidence that she engaged in a protected activity, or that

---

[23] *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 248 (4th Cir.2000).

Kokolis had knowledge of the activity.  ECF No. 25 at 18-19; ECF
No. 31 at 13-14.  Taylor argues that she engaged in three
protected activities, and those activities led to the initiation
of the investigation and prompted Martin and Kokolis to
terminate her rather than give her an 18-day suspension.  *See*
ECF No. 28 at 17.

There are two categories of protected activity--opposition
and participation.  *Laughlin v. Metro. Wash. Airports Auth.*, 149
F.3d 253, 259 (4th Cir. 1998).  Participation includes "making a
charge, testifying, assisting, or participating in an
investigation, proceeding, or hearing."  *Betof v. Suburban
Hosp.*, No. DKC-11-1452, 2012 WL 2564781, at *10 (D. Md. June 29,
2012).  Opposition is a much broader category and includes
"staging informal protests and voicing one's own opinions in
order to bring attention to an employer's discriminatory
activities,"[24] or "complain[ing] to [] superiors about suspected
violations . . . ."[25]  The relevant inquiry is not whether a
defendant actually participated in unlawful actions, but "1)
whether the plaintiff subjectively (in good faith) believed that

---

[24] *Laughlin*, 149 F.3d at 259.

[25] *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543-44
(4th Cir. 2003).

the defendant engaged in an unlawful action; and 2) whether this belief was objectively reasonable in light of the facts." *Betof*, 2012 WL 2564781, at *10.

Taylor asserts that she engaged in three protected activities: "reject[ing] her supervisor [] Borgese's advances," indicating to Lt. Ahmay that Taylor would file an EEOC complaint,[26] and speaking to Tasker about the promotion process for a black Sergeant and the lawyer another employee had used to litigate a grievance.  ECF No. 28 at 17.

The record does not contain any evidence that Kokolis knew of Taylor's comment to Lt. Ahmay or her rejection of Borgese's advances.[27]  "Knowledge of [protected activity] is essential to a retaliation claim." *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998).  If a plaintiff cannot establish that the decision-maker had knowledge of the protected activity at the time of the adverse employment action, her retaliation claim must fail.  *See*

---

[26] Taylor also asserts in her opposition that she threatened to file an EEOC complaint on February 28, 2011 after her Step 1 hearing.  ECF No. 28 at 10.  However, there is no evidence in the record to support this contention.  Therefore, the Court will not consider Taylor's assertion.  *See Allen*, 2013 WL 5442415, at *16.

[27] Because the record is devoid of evidence of Kokolis's knowledge, the Court will not address whether rejecting a supervisor's sexual advances is a protected activity.

*Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998).

Kokolis did know of Taylor's conversation with Tasker.  The County asserts that this is not protected activity and was too vague to be considered opposition.  ECF No. 31 at 14.  The conversation with Tasker involved discussions about a lawyer who had represented another African American employee in a grievance hearing following termination.  Giving all reasonable inferences to Taylor, the conversation with Tasker was a protected activity.

However, even though she engaged in a protected activity, Taylor has not sufficiently rebutted the County's non-retaliatory reason for her termination--her nine policy violations.  Kokolis became aware of Taylor's conversation with Tasker on March 14, 2011.  Kokolis first suggested termination as a punishment for Taylor's conduct on January 24, 2011.[28] Further, after the Step 1 hearing on February 28, 2011, Martin recommended termination.  No reasonable jury could conclude that but-for[29] Taylor's conversation with Tasker, she would not have

_____

[28] On February 1, 2011, Martin said that "termination [was] a strong consideration."  ECF No. 28-13.

[29] Unlike substantive discrimination claims that only require that discriminatory animus be a motivating factor, the plaintiff

36

been terminated.  Accordingly, the Court will grant summary

judgment on the retaliation claim.

   E. Taylor's Title 20 Claims

   1. Notice

   Under the LGTCA, "an action for unliquidated damages may

not be brought against a local government or its employees

unless the notice of the claim required by this section is given

within 180 days after the injury."  Cts. & Jud. Proc. § 5-

304(b)(1).[30]  The notice provision is a condition precedent to

maintaining an action for damages against a local government or

its employees.  *Bibum v. Prince George's Cnty.*, 85 F. Supp. 2d

557, 564 (D. Md. 2000) (*citing Grubbs v. Prince George's Cnty.*,

297 A.2d 754, 755-56 (Md. 1972)).  Thus, compliance with the

provision should be alleged in the complaint as a substantive

element of the cause of action.  *Hansen v. City of Laurel*, 25

A.3d 122, 131 (Md. 2011); *Madore v. Balt. Cnty.*, 367 A.2d 54, 56

---

in a retaliation suit must establish that the adverse employment
action would not have occurred absent the protected activity.
*See Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 133 S. Ct. 2517, 2533
(2013).

[30] The notice must state, in writing, the time, place, and cause
of the injury.  Cts. & Jud. Proc. § 5-304(b)(2).  In Anne
Arundel County, a claimant or her representative must provide
notice in person or by certified mail, return receipt requested,
to the County Solicitor or County Attorney.  *Id.* § 5-304(c)(1),
(c)(3)(iii).

(Md. Ct. Spec. App. 1976).  However, the notice requirement may be waived if the plaintiff can show good cause for failure to comply, *and* if the defendant cannot demonstrate prejudice therefrom.  Cts. & Jud. Proc. § 5-304(d).

"Courts have accepted 'substantial compliance' in lieu of technical compliance if the plaintiff fulfills the purpose of the statute by apprising the proper local officials that plaintiff is pursuing a claim." *Carter v. Jess*, 179 F. Supp. 2d 534, 541 (D. Md. 2001).  "The purpose of the statute clearly would seem to be to have the claimant furnish the municipal body with sufficient information to permit it to make an investigation in due time, sufficient to ascertain the character and extent of the injury and its responsibility in connection with it." *Jackson v. Bd. of Cnty. Comm'rs of Anne Arundel Cnty.*, 195 A.2d 693, 695 (Md. 1963).  Thus, "[t]here must be some effort to provide the requisite notice and, in fact, it must be provided, albeit not in strict compliance with the statutory provision." *Moore v. Norouzi*, 807 A.2d 632, 643 (Md. 2002).

Taylor did not strictly comply with the LGTCA's notice requirement.  However, she "substantially complied" with the requirement by filing an EEOC Charge which described--in detail--the facts underlying her discrimination, hostile work

38

environment, and retaliation claims.  Further, the County had
knowledge of these claims and investigated them before filing
its response to the EEOC.  *See* ECF No. 28-16.  The EEOC
complaint sufficiently put the County on notice of Taylor's
claims.[31]

   2. State Discrimination Claims

   Title 20 prohibits "employer[s]" from "fail[ing] or
refus[ing] to hire, discharg[ing], or otherwise discriminat[ing]
against any individual with respect to the individual's
compensation, terms, conditions, or privileges of employment
because of . . . the individual's race . . . sex . . . [or]
sexual orientation."  State Gov't § 20-606(a)(1)(i).  Maryland
courts "traditionally seek guidance from federal cases in
interpreting [Title 20]."  *Haas v. Lockheed Martin Corp.*, 914
A.2d 735, 742 (Md. 2007); *see also Bishop v. Bd. of Educ. of
Calvert Cnty.*, 2011 WL 2651246, at *9 (D. Md. July 5, 2011)

---

[31] *See also, e.g., Nelson v. City of Crisfield*, No. BEL-10-1816,
2010 WL 4455923, at *2 (D. Md. Nov. 5, 2010) (EEOC notice
substantially complied with LGTCA's notice provision because,
*inter alia*, it provided "notice of the exact nature of [the
plaintiff's] claim at a time when [the City] could conduct its
own investigation"); *Williams v. Bd. of Trs. of Frederick Cmty.
Coll.*, No. Civ.A. CCB03CV2123, 2004 WL 45517, at *5 (D. Md. Jan.
8, 2004) (EEOC charge alleging violations of Title VII gave
adequate notice of plaintiff's claim for violation of equal
protection, because the claims were "parallel[]").

("Maryland courts routinely look to Title VII cases to determine the scope of liability under Title 20."), *aff'd*, 466 F. App'x 261 (4th Cir. 2012).

For the reasons Taylor's federal claims will fail, the Court will grant summary judgment on Taylor's race and gender discrimination claims under Title 20. *See Barnes v. ISG Sparrows Point, LLC*, No. BPG-10-2492, 2011 WL 4596058, at *6 (D. Md. Sept. 30, 2011) (court's race discrimination analysis under 42 U.S.C. § 1981 applied equally to plaintiff's claims under Title 20); *Bishop v. Bd. of Educ. of Calvert Cnty.*, No. DKC 11-1100, 2011 WL 2651246, at *9 (D. Md. July 5, 2011) ("Thus, Plaintiff's Title 20 claims fail for the same reasons as those brought pursuant to Title VII.").

Taylor also asserted a claim for sexual orientation discrimination under Title 20.  Compl. at ¶ 92.  If there is a dearth of evidence about race and gender discrimination, there is even less about sexual orientation discrimination.

The only evidence about Taylor's sexual orientation in the record is that Borgese discovered her sexual orientation after she received a package, which prompted his advances toward her. There is nothing to establish that Lt. Ahmay, Martin, or Kokolis

knew of Taylor's sexual orientation,[32] or that individuals of a different sexual orientation were treated differently.  Further, as previously discussed, Taylor has not presented evidence that the County's non-discriminatory reason for her termination was pretextual.  Accordingly, the Court will grant summary judgment on this claim.

III. Conclusion

For the reasons stated above, the County's motion for summary judgment will be granted.

_1/8/15_
Date

William D. Quarles, Jr.
United States District Judge

---

[32] In his deposition, Kokolis stated that he did not know of Taylor's sexual orientation because at the time of the investigation she was in a relationship with Curley, a male CO. Kokolis Dep. at 53:8-54:9.

41